1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

STINSON LLP
ERIC C. LIEBELER (SBN 149504)
eric.liebeler@stinson.com
1775 Pennsylvania Ave NW
Suite 800
Washington, DC 20006
Telephone:   202.785.9100
Facsimile:    202.572.9973

Attorney for Petitioner
Space Data Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SPACE DATA CORPORATION,

                                    Petitioner,

        v.

HOSIE RICE LLP,

                                    Respondent.

Case No. 3:20-cv-08256-JSC

**EXHIBIT 2 TO DECLARATION OF ERIC LIEBELER IN SUPPORT OF AMENDED PETITION TO VACATE ARBITRATION AWARD**

Date:        November 25, 2020
Judge:      Hon. Jacqueline Scott Corley

# EXHIBIT 2



Hon. Sue L. Robinson (ret.)
Farnan LLP 919 N. Market Street 12th Floor
Wilmington, Delaware 19801


# JUDICIAL ARBITRATION AND MEDIATION SERVICES

# SAN FRANCISCO DIVISION


| | |
|---|---|
| **HOSIE RICE LLP,** | ) |
| | ) |
| **Claimant,** | ) |
| | ) |
| v. | ) **JAMS Reference No.** |
| | )     **1100106722** |
| | ) |
| **SPACE DATA CORPORATION,** | ) |
| | ) |
| **Respondent and** | ) |
| **Counterclaimant.** | ) |


# INTERIM AWARD

## INTRODUCTION

The law firm of Hosie Rice LLP ("Hosie Rice") instituted this arbitration proceeding

under the JAMS Streamlined Arbitration Rules pursuant to its January 28, 2019 Representation

Agreement (Ex 46/512, ¶ 18) in order to collect outstanding fees and costs from its former

client, Space Data Corporation ("Space Data"). The litigation underlying the fee dispute was a

lawsuit filed by Space Data in 2016 against, *inter alia*, Google LLC asserting infringement of

four patents,[1] federal trade secret misappropriation, state trade secret misappropriation, and

breach of contract. *Space Data Corporation v. Google LLC, et al.*, Case No. 16-cv-03260-BLF

(N.D. Cal.) ("the Litigation"). The four patents all involved balloon communication technology.

In this regard, Space Data "provides balloon-based networking and deployable communications

services for first responders," with an objective "to provide wireless service using a fleet or

constellation of balloons located in the stratosphere, at an altitude of approximately 60,000 to

100,000 feet." (Ex. 76 at 4) In the Litigation, Space Data alleged that over the course of several

months in 2007-2008, it met with Google to discuss Google's potential investment in or

acquisition of Space Data. During the course of those discussions, Space Data and Google

entered into a nondisclosure agreement ("NDA"); thereafter, Google performed technical due

diligence of Space Data's balloon technology and Google personnel toured Space Data's

facilities in Arizona. Significantly, Larry Page, one of Google's founders, attended multiple

meetings with Space Data. Several years later, Google represented to the public that it had

"invented" similar balloon technology (christened "Project Loon"). Both Space Data and

Google ultimately filed patent applications relating to balloon communicating systems In 2015,

---

[1] U.S Patent No. 6,628,941 ("the '941 patent"); U.S. Patent No. 9,632,503 ("the '503 patent"). U.S Patent No.
9,643,706 ("the '706 patent"). and U,S. Patent No. 9,678,193 ("the '193 patent"). The '193 patent was considered
to be the most valuable of the four patents.

Space Data provoked an interference proceeding at the United States Patent & Trademark Office; without opposition from Google, Space Data's application (which issued as the '193 patent in June 2017) was granted priority over Google's patent. Based on these events, Space Data accused Google in the Litigation of breaching the parties' NDA, of misappropriating Space Data's trade secrets in connection with Google's development of Project Loon, and of infringing the '193 and related patents.

Although the Litigation was instituted in 2016, Hosie Rice was not engaged to represent Space Data until March 2017. By that time, Google had already prompted a robust motion practice[2] and Space Data was in need of litigation financing. Hosie Rice agreed to a hybrid hourly-contingent fee arrangement. (Ex. 22 at ¶ 3) The preliminary budget submitted by Hosie Rice included $5.1 million in fees, plus a 15% contingency. (Ex. 21) The parties entered into several revised representation agreements; however, the structure of the fee arrangement never changed. (Exs. 24, 38, 46/512) Nor did Space Data's struggles to pay for the Litigation abate over time (see Exs. 23/505, 25, 29, 35, 503, 504, 508), even as the Litigation continued to generate more expenses.[3] By March 2019, the financial constraints of the Litigation had begun to sour the attorney-client relationship between Hosie Rice and Space Data, with Space Data calling out budget overruns by Hosie Rice and Hosie Rice having to fund some part of the Litigation itself. (See Exs. 35, 62, 510) With discovery closing and summary judgment motions scheduled for argument in April, it was determined that case valuations should be prepared and presented to Space Data's Board of Directors ("the BOD"), which valuations would serve as the basis for future settlement demands  Spencer Hosie ("Hosie"), lead counsel for his law firm of

---

[2] Ultimately, more than 60 motions were filed in the Litigation.
[3] In addition to the aggressive motion practice, some 55 days of depositions were taken during the discovery phase of the Litigation

Hosie Rice, prepared such a case valuation, wherein he concluded that a $70-75 million fully paid up license for rights under the '193 patent could be rationally supported, as could damages in the amount of $6-7 million for the trade secret claims (which had a face value of $3.2 million). (Ex. 55) Also presenting a case valuation to the BOD at a March 18, 2019 meeting were retired Judge Randall R. Radar and Eric C. Liebeler, Esquire ("Liebeler"), the latter an acquaintance of Jerry Knoblach ("Knoblach"), President, Chief Executive Officer ("CEO"), and Chair of Space Data's BOD. Judge Radar and Liebeler's valuation was higher than that of Hosie, no less than $100 million plus fees. The BOD discussion following the presentation was not a productive one, with Hosie pushing back on the higher valuation[4] and calling on the BOD for a resolution on a demand number. Although the BOD authorized "some values" in response to Hosie's request for settlement authority, Knoblach made it clear that the values should be shared only if Google approached Hosie; "[t]hat authority does NOT include you reaching out to the other side with a number without getting further approval from your client." (Ex. 702) In response, Hosie characterized the missive as "one of the more obnoxious client emails I have ever received. We are your lawyers. Not your pool boys." (Ex. 704) Hosie also made it clear that, from his perspective, the BOD was his client, "[n]ot the ceo." (Ex. 62) Consistent with the mounting tensions between Hosie and Knoblach, at a subsequent BOD meeting held on April 3, 2019, the BOD retracted the March 18 resolution regarding settlement and determined that Liebeler should be part of the litigation team. (Ex. 66)

Amidst the internal drama between Space Data' management and the Hosie Rice litigation team, the Litigation was playing out. On April 11, 2019, oral argument was heard on pending summary judgment motions related to both Space Data's trade secret and the '193 patent

---

[1] Including characterizing the Loon technology as more sophisticated than that of Space Data (Space Data was described by Hosie as a "scooter" and Loon as a "Ferrari").

infringement claims. According to Hosie, because the '193 claim was regarded by Space Data as being much the stronger of the claims, he allocated the responsibility of argument to a less experienced lawyer ("Martin"), while he assumed the task of arguing what was believed to be the weaker trade secret claim. At the hearing and before Martin even finished his introductory remarks, Judge Freeman interrupted and expressed her skepticism about the meaning of the "determining locations . . . relative to . . ." limitation of the '193 patent and, consequently, infringement of that limitation. (Ex. 69)

Given Judge Freeman's negative response to the '193 claim, the BOD passed a resolution on May 6, 2019, authorizing a demand to Google in the amount of $70 million, which demand would expire upon issuance of the summary judgment decision. "This is for settling the counts in the current suit and does not include international patents as we still need to value those." (Ex. 549) In a decision issued on May 9, 2019, Judge Freeman construed the above limitation adverse to Space Data, and entered a judgment of non-infringement in favor of Google. However, the trade secret and NDA claims survived. (Ex. 76, 623)

By June 3, 2019, the acrimonious communications between Hosie and Knoblach resumed, with Knoblach telling Hosie that "[c]ommunication with the Board and Paul Crawford at SDI[5] – should come through the Chairman of the Board not direct." (Ex. 663) Hosie continued to relate that "[t]he Board is my client." (Ex. 78)

The valuation of the case became ever more important as mediation efforts between Space Data and Google were attempted in June 2019. The mediation was not successful. According to Diane Rice, Hosie's partner at Hosie Rice, the mediator subsequently shared that, although Google was prepared to settle, it had little monetary flexibility to settle in a partial deal

---

[5] Paul Crawford and Space Data Investments LLC provided litigation financing to Space Data. Paul Crawford, on behalf of SDI, consented to the January 28, 2019 Representation Agreement. (Ex. 46/512 at 8)

given the face value at best of $3.2 million for the remaining trade secret case. It was the mediator's opinion that Space Data should aim for a settlement higher than any realistic recovery in trial, which required a realistic demand. Knoblach apparently came across at the mediation as "letting emotions guide him instead of business acumen." (Ex. 85)

At the June mediation, Hosie floated the idea of a partial settlement, settling all but the '193 patent claim which would be carved out and proceed to appeal. Although the mediation did not produce a resolution, Google's attorney, Robert Van Nest ("Van Nest") reached out to Hosie a few days later to continue the discussion. Hosie informed Knoblach that Google wanted Space Data to price a partial settlement: Knoblach declined to do so. (Ex. 527) Hosie shared this with Liebeler who, according to Hosie, "agreed that it would be irresponsible not to make a demand." (Ex. 86/528) By a memorandum dated June 30, 2019, Hosie shared directly with the BOD (as well as Knoblach and Liebeler) a settlement update and counsel recommendation. (Ex. 87/529) Hosie recommended a demand number of $24 million.

Thereafter follows a complicated and hard-to-follow sequence of emails, texts, voice messages, and memos that track – albeit imprecisely – the course of the subsequent settlement negotiations between Google (primarily through Van Nest, its lead counsel) and Space Data (primarily through its lead counsel, Hosie, with side discussions variously among and between Hosie, Knoblach, Liebeler, and the BOD) I will summarize the chronology of these negotiations consistent with my understanding of the record and the relative importance of the events to the disputes at issue.

On July 2, 2019, Van Nest communicated to Hosie Google's counter to the Space Data proposal· "Google is prepared to pay $3 million in settlement on the framework we discussed yesterday In other words dismissal/release on trade secret claim, NDA, and '706, while SDC

retains right to appeal '193 patent and the other two dismissed patents." (Ex. 531)  Rather than communicate this offer directly to Space Data, Hosie in his communications with Liebeler on that day indicated that he would "try to develop a sense of what goog might in fact pay." (Ex. 629)  At Liebeler's request, Hosie prepared a "Final Settlement Analysis and Recommendation" to share with the BOD.  Among other scenarios discussed, Hosie opined that a "prompt all cash settlement with Google for $6 million" would avoid "one million dollars in trial fees and costs," thus providing "an immediate $7 million benefit to Space Data." (D.I. 648)  The settlement memo was dated July 5, 2019, and was prepared for a July 8 BOD meeting.

There is a series of communications on July 8 – 9 between Hosie, Knoblach, and Liebeler which illustrate the deteriorating relationship between Hosie and his client.  For instance, while Hosie is recommending settlement, Knoblach is urging Hosie in an email exchange on July 8 to "aggressively press what we do control which is a firm trial date." (D.I. 661)  Hosie shares this email with the BOD and critiques Knoblach'ss analysis.  In response to Hosie's actions, Liebeler asks Hosie to identify the "authority for the proposition that you should be communicating directly with the Board despite the CEO's direct instruction to you otherwise."  Hosie opines that the BOD is his client; Liebeler disagrees, opining that since the "Client" is "Space Data Corp.," the "Client" through its CEO has every right to direct the channel of communications.  (Ex 661/858)  More importantly, by email dated July 9, 2019, SH obliquely relays Google's July 2nd offer·

> [SDC's d]emand communicated  Dismissed as absurd.  He [RVN] said no way could we ever get anything close to that number if we tried the case sbd win everything in the best way possible (this is inexorably true).  **He hinted that he cld get to just below face, which I took to be three M**.  There is more money there and I am sure google will [put] more than face, perhaps millions more than face.  But it will not be near the kind of numbers you are talking.  Just will not happen.

I put 6 in my memo as number I thought but was not sure we could get. We need to Counter at a real number. Or will be in a world of hurt on 7.19. So prompt response pls.

Jk pls promptly send this to the board and copy me on the mail. Thanks.

(Ex. 533)

It is unclear when the above information was communicated to the BOD (*see* Exs. 866, 867, 868, 533); apparently Hosie was not informed of it, leading to an "[u]rgent [r]equest for [a]uthority" to counter "at no more than 14" on July 10, 2019, a week before the pretrial conference. Again Hosie asks for confirmation that his request has been communicated to the BOD. (Ex. 633) The issue of communications is finally resolved through a BOD resolution shared with Hosie on July 12, whereby the BOD "directs Hosie Rice LLP to immediately cease communicating directing with the Corporation's Directors. . ." (Ex 540), which Hosie sees as making his law firm "adversarial with the client." (Ex. 539)

Also on July 12, Hosie sends notice of the first trial preparation session (Ex. 1135) and "confirms that Google, through Robert Van Nest, its lead counsel, has fully, officially, and of-record offered $3 million to settle the breach of contract case, the trade secret case, and the '706 patent case." (Ex 118) The proposed deal would exclude the '193, '503, and '041 patents. Hosie urged Space Data "as strongly as possible to counter at $14 million." (*Id.*)

By email dated July 15, Liebeler informs Hosie that he has "authority to counter at $19.5 million for release of the NDA and trade secret claims and a covenant not to sue on the '706 patent." (Ex. 542) Hosie pushes for a counter at $14 million; Liebeler agrees that responding to Google with a $19.5 million counter will not keep settlement discussions alive. (Ex. 131) It, frankly, is unclear what if anything was communicated to Google or when, just that Google offered $4 million in settlement around July 18 and, despite Hosie's recommendation

that Space Data counter at $14 million a week earlier, by the evening of July 18, Hosie was

declaring in an email to Liebeler:

> How do you, or the Board, justify demanding that G pay MORE than
> three times face value. . . This is not negotiating in good faith. It is not a
> nuanced question of judgment. It is irrational. I assume that this is more
> of Mark Knoblach and Jerry Knoblach wishful thinking that they can shake-
> down Google because Larry Page either cannot or will not testify. I do not
> think this is a reasonable gamble.
>
> Please tell the Board in writing that their trial lawyers, whom they have instructed
> not to talk to the Board, think that there is a significant risk that this approach to
> settlement may lead to a sizeable fee award against SDC if SDC loses. Pls let me
> know in writing when you have done so. I insist on this, Eric. I cannot have my firm
> be sued because someone claims we did not warn.

(Ex. 138)

The pretrial conference took place on July 19, 2019. Judge Freeman asked for briefing

on a point raised by Google regarding the termination clause of the NDA and its application to

the pending Litigation. At lunch following the conference, Hosie offered to fund $1 million of

the '193 appeal/trial in exchange for moving the contingency up two points, but indicated that his

"constructive termination" justified his withdrawing as counsel at the conclusion of the trade

secret/NDA trial if Space Data did not settle at his recommended number which, on that day, was

between $6 million and $10 million. Liebeler asked Hosie to confirm that, if Space Data settled

on agreeable terms, Hosie would be "committed both emotionally and intellectually to the

remainder of the case. He said he would be." (Ex. 142/1130) Liebeler observed in this email

that "Jerry and SG mix like oil and water. That is unfortunate but it is reality." (*Id.*)

So the stage is set for the final settlement negotiations between Google and Space Data.

Hosie has neither a healthy relationship with his client nor does he have a direct line of

communications with his client, having instead to relay the real-time negotiations taking place

with Van Nest (in California) through Liebeler (who is in Washington, D.C.) to the BOD (the

8

members of which were located in several states) and back again. It should not be a surprise to anyone, then, that the complexities of a negotiation handled in this fashion would be disjointed.

On July 23, Liebeler authorized Hosie to respond to Google at "$9.7 M in exchange for NDA, TS and covenant on '706," with Space Data's recovery from this partial settlement "to not be less than $4.0M." (Ex. 156) In addition to the $4 million "hard-stop number" (or Space Data tries the case), Liebeler writes to confirm a number of financial concessions on the part of Hosie Rice. (*Id.*) Hosie responds: "Do I have authority to move forward and close at a deal that nets sdc 4?" (*Id.*) Liebeler: "I think so, let me confirm." (*Id.*) By July 24, Hosie acknowledges that this "is a clever structure as it makes any lower amount my deferral problem, given hard stop 4 to Sdc. Really will test, in an objective and empirical way, my belief that settlement is better than trial at a multiple of face." (*Id.*) Hosie and Liebeler continue to discuss parameters of settlement vis a vis covenants not to sue under both the '941 and 503 patents. (Ex. 157)

A lot happened on July 25, 2019. On the one hand, Hosie was moving forward on the general premise that, so long as Space Data netted $4 million, he had authority to settle under standard terms and conditions. Space Data apparently thought otherwise, either unaware of the terms and conditions generally used in resolving intellectual property disputes, or perhaps still believing that it had the upper negotiating hand under the extant circumstances (despite 3 of its 4 patents being dismissed and its trade secret/NDA claims being questioned). In any event, Space Data declined to provide a general release on either its domestic or international patents, ignoring Hosie's advice that "California law is standard on this," i.e., a party cannot settle, take the money, and then subsequently sue the opposing party for a claim it had at the time of settlement. (Ex. 166, *see also* Ex. 978) There was much discussion about the possible existence of Brazilian

counterparts to the '941 patent and whether they would be included in any release. (Exs. 197, 168/680, 989, 177, 684)

By the afternoon of July 25, 2019, the first draft term sheet from Google (Ex. 1129) was forwarded by Hosie to Liebeler who forwarded it on to Knoblach. Liebeler observed that ███

███████████████████████████████████████████████████████████████████████████████████████

678) Knoblach responded that Space Data had "TONS of other patents and applications. Also this only applies US claims." (Ex. 679) Hosie's response was predictable, that releases were always a part of patent settlements and licenses, otherwise, it "would not be a settlement at all, just a down payment on future litigation." (*Id.*) Hosie asked Knoblach and Liebeler to go through the term sheet and make a list of issues and circulate "ASAP. The cl[o]ck is ticking on the nda motion." Hosie also suggested a call. (*Id.*) (*See also* Exs. 681, 683)

On July 26, Knoblach indicates that the settlement described in the term sheet "oversteps the Board's authority which was limited to resolving the active claims remaining in the August Trial and a covenant to not sue on the '706. If the settlement includes more than that then there needs to be another board meeting and the board needs to be educated on the Brazil issues." (Ex. 185/1003) Hosie describes the patents in Brazil as "terminally abandoned" and "nonexistent" and encourages the BOD to sign the term sheet. (*Id.*) There is no evidence of record about the existence or extent of Space Data's international patent portfolio.

A second draft term sheet was circulated on July 26. (Ex. 605) Liebeler informs Hosie that there are two options to moving forward: (1) Google grants a worldwide covenant not to sue on current patents and three-years forward, reciprocal to what Space Data was asked to grant with the only carve-out being the '193 patent; (2) because there was a "legitimate disconnect on

10

whether foreign analogs were part of the deal," SDC would need more cash in the deal to grant those. (Ex. 191/564) Liebeler instructed Hosie that he had "discretion to pitch these to RVN" as he saw fit. (*Id.*) In response to Hosie's suggesting a "CNS from Loon to Space Data," Google's counsel indicated that they were available to discuss despite the fact that it had not been part of any discussions to date. (Ex. 196/606)

As noted, because of the time differences between Hosie's communications with Van Nest in California, Hosie's communications with Liebeler in Washington, D.C., and Liebeler's communications with Knoblach (perhaps in Arizona), it is difficult to determine the exact chronology of the final events of the settlement process that occurred on July 26, 2019. There can be no dispute that the basic structure of the deal ███████████████ had been agreed to by Space Data; the outstanding issues dealt with the scope of the settlement vis a vis patents other than those at issue in the Litigation. In this regard, Hosie shared with Liebeler that Google did not want to do a covenant not to sue "sdc under loon patents in full settlement agreement as it creates a bad . . . precedent for goog. But RVN will execute a side letter agreement, which we will countersign, saying just this." (Ex. 208/567) The record indicates that Hosie was anxious to seal the deal before Judge Freeman had the opportunity to rule against Space Data on its trade secret/NDA claims, and pushed Liebeler to get the term sheet executed "yesterday." (Exs. 207/582, 252, 609, 610) As noted, by 3:30 p.m. Pacific Time, an execution copy of the term sheet had been forwarded to Liebeler for "final review and signature." Liebeler was informed by a member of the Hosie Rice team to "go ahead and have Jerry sign and send us the signed copy, and we will hold his signature until we have confirmation that the side letter is agreed." (Ex. 614)

In the end, Hosie authorized Van Nest to send to the Court a notice of settlement around 4:15 p.m. Pacific Time, ████████████████████████████████████████

████████████████████████████████████████████████████████████

(Exs. 201, 203, 205/580, 581, 597)  The letter, of course, fell short of the broad reciprocal covenant not to sue sought by Space Data, and was forwarded to Liebeler sometime after the Court notice was sent.  (Exs. 614, 211/593, 215/1061)

In a series of communications between Hosie and Liebeler on July 27, Liebeler observes that the side letter does not accomplish a "worldwide covenant not to sue on Google's current patents."  Hosie responds that, unless Space Data is planning on doing something in the future that will read on an existing Loon patent (which reads on very different systems), the side letter accomplishes "reciprocal peace."  Liebeler replies: "I don't know.  I am sure that Jerry expects this now, given that's what I told him yesterday.  Agnostic as to whether it is in the side agreement or the main term sheet, but Jerry sees value in it."  (Ex. 221)

Also on July 27, Space Data transmitted to Google a copy of the "final" term sheet as marked-up by Knoblach.  (Ex. 215/1061)  Google's counsel responded as follows:

> We do not agree and are not bound by any changes to the term sheet that were not disclosed to us until after our clients had executed the term sheet and the Court was advised that there was a signed, binding term sheet. ██████████████████████
> ████████████████████████████████████████████████████████████
> in reliance on your express representations that the term sheet was agreed to and that your client was executing it.  In particular, we do not agree to change the timing of payment or the timing of the IPR termination request.  As I know you appreciate, those events are necessarily dependent upon ███████████████████████████
> Mr. Knoblach's other "nits," any further wordsmithing is for ██████████████
> ████████ at this point.

(Ex. 599)  There is no mention of the side letter in this exchange between Space Data and Google.

By July 28, Knoblach is admonishing Liebeler to "NOT send the signed term sheet until we get an acceptable consent to not sue on Loon Patents," even while acknowledging that rejection of the side letter may "crater the settlement." (Ex. 228/1106)  At a BOD meeting convened by Knoblach on July 28, the BOD "delegate[d] authority to Management to negotiate a Settlement Term Sheet materially similar to the Google Term Sheet (distributed on Friday evening) coupled with a covenant from Google not to Sue the Company for infringement for four years on any patent and in perpetuity on any Loon related patents or patent applications that currently exist worldwide materially similar to the Term Sheet2 (distributed this morning)." The BOD rejected an offer of indemnity by Hosie and insisted that "preparation for trial must continue until a mutual settlement is reached." (Ex. 1116)

By July 29, Hosie is indicating to Liebeler that he is being told to withdraw, and by August 1 Hosie is asking Liebeler for an update because of the suggestion that he did something wrong  (Ex. 206 @SD0009229)  Also on August 1, Liebeler informs Knoblach that he will inform Google that Space Data will ████████████████████████████████ ███████████████████ (Ex. 206 @SD0009231)  On August 6, 2019, Space Data terminated Hosie Rice's representation.  (HR brief at 33)  Ultimately, the ████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

619:24)

## LEGAL STANDARD

Hosie Rice instituted this arbitration seeking over $5 million in deferred fees and costs (Ex. 253), as well as its contingent portion of the $8 million Space Data received in ████████ (approximately $1.3 million) and a lien on any "193 proceeds, based on quantum meruit and Space Data's alleged fraud, breach of the representation agreement, and breach of the implied covenant of good faith and fair dealing. In response to Hosie Rice's demands, Space Data counterclaimed for professional negligence/legal malpractice, fraud, breach of fiduciary duty, breach of the representation agreement, and breach of the implied covenant of good faith and fair dealing  Space Data is seeking a complete disgorgement of fees already paid to Hosie Rice ($2,833,915.41), and to preclude Hosie Rice from collecting any further fees now or in the future. Through briefing, Space Data has withdrawn its counterclaim of professional negligence/legal malpractice, because of a recognized failure to quantify any actual loss or damage attributable to such alleged misconduct. (SDC brief at 48)

I start with the legal standard for forfeiture, as it is described in the Restatement (Third) of the Law Governing Lawyers § 37 (2000).

> A lawyer engaging in clear and serious violation of duty to a client may be required to forfeit some or all of the lawyer's compensation for the matter. Considerations relevant to the question of forfeiture include the gravity and timing of the violation, its willfulness, its effect on the value of the lawyer's work for the client, any other threatened or actual harm to the client, and the adequacy of other remedies.

According to the Restatement, "[a] lawyer is not entitled to be paid for services rendered in violation of the lawyer's duty to a client," and such "improper conduct can reduce or eliminate the fee that the lawyer may reasonable charge." (*Id.*, comment a)  The Restatement goes on to state that "[f]orfeiture of fees, however, is not justified in each instance in which a lawyer violates a legal duty, nor is total forfeiture always appropriate." (*Id.*, comment b)  Forfeiture may

14

be required when a lawyer engages in a "clear and serious" violation of a duty to the client. "A violation is clear if a reasonable lawyer, knowing the relevant facts and law reasonably accessible to the lawyer, would have known that the conduct was wrongful." (*Id.*, comment d) "To warrant fee forfeiture a lawyer's violation must also be serious." (*Id.*) In this regard, "[f]orfeiture should be proportionate to the seriousness of the offense," which may depend on such factors as "the extent of the misconduct" in terms of the gravity and timing of the violation, whether the breach was knowing, its effect on the value of the lawyer's work for the client, any other threatened or actual harm to the client, and the adequacy of other remedies. (*Id.*) In other words, the determination (like the remedy) is an equitable one, with the Restatement recognizing that "[u]ltimately the question is one of fairness." (*Id.*, comment e)

The parties have identified relevant California case law in this regard, the most helpful being the decision of the Supreme Court of California in *Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Co., Inc.*, 6 Cal. 5th 59 (2018). The Court in *Sheppard* rejected a categorical remedy for lawyer misconduct and, citing to the Restatement, recognized that "[t]he degree to which forfeiture is warranted as an equitable remedy will necessarily vary with the equities of the case." *Id.* at 90.

In the absence of complete disgorgement, California courts have allowed attorneys to recover fees on a quantum meruit basis notwithstanding allegations of impropriety. The Court in *Sheppard* explained in this regard that it is the attorney's burden to demonstrate that he has provided services of value "in light of the harm done to the client and to the relationship of trust between attorney and client." 6 Cal 5th at 90  Once apprised of the facts, "the trial court must then exercise its discretion to fashion a remedy that awards the attorney as much, or as little, as equity warrants, while preserving incentives to scrupulously adhere to the Rules of Professional

Conduct." *Id. See also Cal Pak Delivery, Inc. v. United Parcel Service, Inc.,* 52 Cal. App. 4th 1, 16 (Cal. App. 1997) (fees may be limited to the value of services rendered before the violations occurred).

## DISCUSSION

Space Data alleges that the following conduct (undertaken by Hosie) demonstrates that Hosie Rice breached the fiduciary duties owed to its client: (1) insulting the CEO and chairman of the BOD; (2) seeking to undercut the CEO to the BOD; (3) assigning to himself authority he did not have by calling a vote at a BOD meeting; (4) "pick[ing] fights" with the CEO; (5) ignoring the CEO's request to cease communicating directly with the BOD; (6) permitting an associate to argue a "nine-figure claim" on summary judgment without client notice or permission; (7) withholding Google's first written settlement offer from Space Data, (8) responding to the written offer without any authority "or even checking" with his client; (9) sharing with third-party financier Paul Crawford confidential and privileged information; (10) "refus[ing] to conform his representation to the idea" that Space Data could communicate with him through its CEO and board chair or its outside counsel; (11) "falsely assert[ing] a breach of contract and defend[ing] it frivolously;" (12) ignoring "explicit settlement terms" Space Data had articulated; (12) threatening to withdraw unless Space Data settled on his terms; (13) disobeying Liebeler's direct instruction to refuse a general release; (14) withholding that first term sheet he received from Google; (15) falsely informing Liebeler that Google had agreed to the covenant Space Data sought; (16) withholding the side letter from Space Data, instead executing and returning it to Google's counsel; (17) violating his own associate's promise to hold his client's signature pending approval of the side letter, and (18) lying to Space Data, opposing counsel,

16

and the Court "in order to settle the case outside his authority on terms to which Space Data never agreed." (SDC brief at 36-37)

I start with a recognition that ███████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ Google had a great deal of experience with patent litigation and had a reputation for driving a hard bargain with an eye towards its entire portfolio, not just the case at hand. There is no indication of record that Space Data had any experience with any kind of litigation; nor did its outside counsel (Liebeler) have any patent litigation experience. Given the posture of the litigation between Space Data and Google, ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████ The fact that Space Data admittedly could not prove any actual loss or damages caused by Hosie's conduct in this regard proves the point.

As noted by Space Data, however, the lack of quantifiable damages is not a categorical obstacle to its quest for complete forfeiture of all fees paid or owed to Hosie Rice. So although "the rule governing attorney forfeiture derives primarily from the general principle of equity that a fiduciary's breach of trust undermines the value of his or her services," *Sheppard*, 6 Cal 5th at 89, the consideration of multiple factors is appropriate in determining whether Hosie's conduct constituted such "clear and serious" violations of his duty to Space Data as to warrant complete forfeiture, with "fairness" being the key.

Some of the conduct identified by Space Data[6] relates to the poor (and, therefore, feckless) individual relationship that existed between Hosie and Knoblach starting in March

---

[6] For instance, insulting and picking fights with Knoblach, and seeking to undercut Knoblach's authority with the BOD by, e.g., directly communicating with the BOD and exceeding his authority by calling a vote of the BOD

2019. The record illustrates how both of these individuals contributed to the state of their relationship and any injury that Space Data, the corporate client, suffered. Therefore, although Hosie was aware of his disrespectful conduct, such conduct standing alone does not, in my mind, constitute clear and serious violations of Hosie's fiduciary duty to Space Data.

Some of the allegations[7] relate to conduct that, while not an example of the best practices a lawyer should embrace, would not normally be deemed a violation of an ethical duty, especially in the factual context of this dispute. With respect to Hosie's asserting breach of contract due to his inability to communicate directly with the BOD, it certainly was a diversion of everyone's focus and did not help the lawyer-client relationship between him and Space Data. As to Hosie's communications with investor Paul Crawford, it is debatable how much of the information shared was confidential to Space Data; moreover, it was Crawford who initiated many of the communications in the first instance and had to be told by Hosie that "all communications go thru" Knoblach. (Ex. 544) With respect to the summary judgment oral argument, clients generally are kept apprised of which members of the law firm are involved in a case and in what capacity. The fact that Space Data was not informed that an associate (rather than Hosie) would be presenting argument on what was believed to be the most important claim in the Litigation (the '193 patent) is reflective of the eroding relationship between Hosie Rice and Space Data, setting aside any speculation about whether Hosie could have been more persuasive than his associate.

The remainder of Space Data's allegations relate to the course of the settlement negotiations and Hosie's conduct in connection thereto. I understand that, during this period of time, Hosie was responding in some measure to the pressures of a high-stakes negotiation in a

_____

The allegations involving Hosie asserting breach of contract. discussing Space Data matters with an investor, and permitting an associate to argue an important claim on summary judgment

complicated intellectual property case adverse to a sophisticated player where his client had already lost the right to try the '193 patent and could potentially lose its trade secret/NDA claims.  Space Data did not help the situation, with its lack of patent litigation experience, less than efficient mode of communications and decision-making, and lack of trust at this point in Hosie's advice.  Add to that the financial constraints under which both Hosie Rice and Space Data were operating, it is no wonder that Hosie and Space Data did not end up at the same settlement at the same time.

Nevertheless, Hosie's conduct is troubling.  Although his withholding and rejecting Google's July 2 offer ultimately had no effect on the outcome of the case since that initial offer clearly was not acceptable to Space Data, Hosie's suggestion on July 12, 2019 that the offer was a new one shades the truth.  (Exs. 531, 118)  The record also demonstrates that Hosie informed Google of his client's consent to broader settlement terms than Space Data wanted or authorized Hosie to accept, and informed the Court prematurely of an agreement between the parties.  In this regard, as the settlement negotiations lurched forward, ███████████████████ ███████████████████████████████████████████ There was a disconnect between Hosie's and Space Data's respective views as to the proper scope of the settlement, with Hosie pushing for the standard terms and conditions in a patent case (including the need for a release with the goal of global peace) and Space Data pushing for a very narrow settlement, limited to the claims at bar.  Hosie was probably the more correct in his approach, but it was not his call.  A lawyer gives advice; the client makes the decisions.  In this case, Hosie usurped at least some of Space Data's decision-making authority ███████████████ terms that were not consistent with his instructions from Space Data and that were not agreed to by Space Data before the Court was informed of such.

Having concluded that, I do not believe that a complete disgorgement of all fees paid to Hosie Rice is appropriate. As I stated at the outset of this discussion, this is not a case where ███████████████████████████████████████████████████████████████ not expect. With no evidence to the contrary, █████████████████████████████████ ██████████████ and due in no small measure to the efforts of Hosie Rice. Nor do I believe that Hosie Rice should be precluded from recovering on its quantum meruit claim for work performed even under the cloud of Hosie's misconduct. To put this conclusion into the words of the California Supreme Court in *Sheppard,* while Hosie's conduct damaged beyond repair the attorney-client relationship with Space Data, Space Data suffered little other harm.

## CONCLUSION

In fashioning a remedy that balances the negligible harm to Space Data vis a vis the settlement agreement with the harm Hosie's conduct exacted on his attorney-client relationship with Space Data, I am mindful of both the good result and the bad conduct. It should not be surprising that any equitable remedy will have to accommodate this inconsistency. In light of the fact that the harm I am focused on is the harm to the attorney-client relationship caused by Hosie's conduct, it is instructive that even he described his firm's relationship with Space Data as "adversarial" by July 12, 2019. (Ex. 539) I find that the professional services of Hosie Rice were rendered less valuable to its client, Space Data, as of July 12, 2019.

Consistent with the underlying structure of ███████████ ██████████ and with ¶ 3 of the parties' Representation Agreement (Ex. 46/512), I conclude that Hosie Rice shall be paid in quantum meruit its fees and costs for services rendered through July 11, 2019, as follows: (1) the source of payment shall be the $8 million ██████████ – immediate payment will bring this dispute to a close; (2) based on the underlying premise that ██████████ ██████████

20

██ ██ ████████, Hosie Rice's fees and costs may not exceed $4 million; (3) nevertheless, Hosie Rice is not entitled to $4 million but shall provide to Space Data its invoice for fees and costs through July 11, 2019 calculated from the invoices regularly submitted to Space Data (Ex. 253); (4) once the fees and costs have been determined[8] and paid to Hosie Rice, Hosie Rice shall transfer within thirty (30) days to Space Data the remainder of the $8 million ██████t fund.

I find that Hosie Rice is not entitled to any additional contingency award;[9] therefore, I instruct that Hosie Rice remove any and all liens that it has asserted, claimed, or filed related to the Litigation. To the extent that the parties have alleged fraud, breach of contract, and breach of the implied covenant of good faith and fair dealing, these claims add nothing to the ultimate decision and remedy and, therefore, are dismissed. Finally, it is my conclusion that neither Hosie Rice nor Space Data were without fault in this dispute, and neither of the parties are receiving exactly what they requested as relief. Consequently, each party shall bear its own fees and costs related to this arbitration, and no interest shall be awarded.

Respectfully submitted,

Hon. Sue L. Robinson (ret.)
January 16, 2020

---

[8] As Hosie Rice submitted its invoices on a regular basis (Ex. 253) with no complaint from Space Data, I trust that the amount due to Hosie Rice will be a simple calculation. If a dispute arises in this regard, however, I will remain available to resolve it and have characterized this as an "Interim Award" in case the need for further proceedings arises.

[9] Although Hosie managed to salvage an appeal for the '193 patent ██████, ████████, he was lead counsel for the unsuccessful summary judgment proceedings and will play no role in the appeal or trial (if the appeal is successful) of the '193 patent.

21

**PROOF OF SERVICE BY EMAIL & U.S. MAIL**

Re: Hosie Rice LLP vs. Space Data Corporation
Reference No. 1100106722

I, Elizabeth Magana, not a party to the within action, hereby declare that on January 16, 2020, I

served the attached INTERIM AWARD on the parties in the within action by Email and by depositing true

copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at San

Francisco, CALIFORNIA, addressed as follows:

Robert H. Torgerson Esq.
Jon M. Woodruff Esq.
Stinson LLP
50 South Sixth St.
Suite 2600
Minneapolis, MN  55402
Phone: 612-335-1500
robert.torgerson@stinson.com
jon.woodruff@stinson.com
    Parties Represented:
    Space Data Corporation

Eric C. Liebeler Esq.
Christy M. Milliken Esq.
Stinson LLP
1775 Pennsylvania Avenue NW
Suite 800
Washington, DC  20006
Phone: 202-785-9100
eric.liebeler@stinson.com
christy.milliken@stinson.com
    Parties Represented:
    Space Data Corporation

Carrie Francis Esq.
Stinson LLP
1850 N. Central Avenue
Suite 2100
Phoenix, AZ  85004
Phone: 602-279-1600
carrie.francis@stinson.com
    Parties Represented:
    Space Data Corporation

David S. McMonigle Esq.
Joseph P. McMonigle Esq.
John B. Sullivan Esq.
Long & Levit LLP
465 California St
Suite 500
San Francisco, CA  94104
Phone: 415-397-2222
dmcmonigle@longlevit.com
JMcmonigle@longlevit.com
jsullivan@longlevit.com
    Parties Represented:
    Hosie Rice LLP

I declare under penalty of perjury the foregoing to be true and correct. Executed at San Francisco,
CALIFORNIA on January 16, 2020.

Elizabeth Magana
EMagana@jamsadr.com